**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**TASHA FINKLEY,**

    Plaintiff,                                  **Case No.:**
                                                    **JURY DEMAND**

v.

**CITY OF WEST PALM BEACH, FLORIDA,**

    Defendant.

---

**COMPLAINT FOR DAMAGES AND REQUEST FOR JURY TRIAL**

**COMES NOW**, Plaintiff, Tasha Finkley ("Ms. Finkley" or "Plaintiff"), by and through her undersigned counsel, and sues Defendant City of West Palm Beach, Florida ("Defendant"), for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), and 42 U.S.C. § 1981 ("Section 1981"), and in support thereof alleges as follows:

**PARTIES**

1. Ms. Finkley is an African American female and a resident of Palm Beach County, Florida.

2. Defendant is a municipal corporation organized under the laws of the State of Florida, with its principal place of business located at 401 Clematis Street, West Palm Beach, Florida 33401.

3. At all times relevant hereto, Defendant employed more than fifteen (15) employees and was an "employer" within the meaning of Title VII and Section 1981.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the events giving rise to this action occurred within this judicial district.

## ADMINISTRATIVE EXHAUSTION

6. On November 26, 2024, Ms. Finkley timely filed Charge No. 510-2025-02109 with the Equal Employment Opportunity Commission ("EEOC"), alleging race discrimination, gender discrimination, and retaliation.

7. On October 20, 2025, Ms. Finkley timely filed Charge No. 510-2026-00841 with the Equal Employment Opportunity Commission ("EEOC"), alleging race discrimination, gender discrimination, and retaliation related to her termination occurring on December 13, 2024.

8. On December 9, 2025 the EEOC issued a notice of right to sue for both timely filed charges, 510-2025-02109 and 510-2026-00841.

9. The instant matter was filed within 90 days of receiving the notices of right to sue.

## FACTUAL ALLEGATIONS

**Defendant Recruits, Controls and Employs Ms. Finkley**

10. In August 2023, Defendant hired Ms. Finkley as an independent contractor through Robert Half, Inc. ("Robert Half") to work in the Information Technology Department.

11. Defendant acted as a joint employer exercising significant control over contractors from Robert Half.

12. Not only was the work performed by Robert Half contractors identical to that performed by Defendant's permanent employees, but Defendant dictated when, where, and how the contractors worked.

13. Defendant fully integrated Robert Half contractors into its operations requiring them to work in Defendant's facilities, use Defendant's email addresses and systems, attend mandatory staff meetings and work specified hours.

14. Contractors were also integrated into the IT Department's organizational structure because they were required to use Defendant-provided equipment, including laptops, and utilize Defendant's IT systems and networks as part of their job duties.

15. Paul Jones ("Jones"), Defendant's Chief Information Officer, exercised direct control over contractors' work conditions and schedules.

16. Jones was the gatekeeper for remote work for contractors and employees working in the IT Department. He approved the remote work of contractors Byron Centeno, Christina Guarin, Chris Esler, and Jerry Binder.

17. Jones dictated lunch schedules and imposed mandatory meeting attendance requirements on contractors.

18. Jones provided daily work assignments, controlled project assignments, and directed the manner and means of work performance.

19. On July 22, 2024, Defendant hired Ms. Finkley as a permanent, full-time employee in the position of Systems Analyst in the IT Department.

20. Her an annual salary was $79,932.23.

21. Although her offer letter stated she would report to Miguel Gamino, throughout her employment, Ms. Finkley reported directly to Jones.

**Defendant's Disparate Treatment of Ms. Finkley Based on Her Immutable Characteristics of Race and Gender**

22. From the start, Ms. Finkley was subjected to discriminatory treatment based on her race and gender.

23. Ms. Finkley had four similarly situated Systems Analyst colleagues: Behrooz Basseri; Chris Esler; Jerry Binder; and Donna Andrews.

24. Chris Esler and Jerry Binder are White males who began their employment with Defendant after Ms. Finkley.

25. Donna Andrews is a White female.

26. Behrooz Basseri is a non-African American male.

27. Unlike her non-African American counterparts, Ms. Finkley was the only employee required to work in the office five days per week with no remote work privileges.

28. Donna Andrews and Behrooz Basseri were granted remote work privileges.

29. Jerry Binder relocated to Sarasota while working for Defendant and was granted extremely flexible remote work arrangements.

30. Both Chris Esler and Jerry Binder were granted remote work privileges immediately after beginning their employment as contractors.

31. Ms. Finkley, on the other hand, was repeatedly denied the ability to work remotely despite her seniority in time as compared to Binder and Esler.

32. The decision to deny privileges to Ms. Finkley enjoyed by her non-African American counterparts and freely given to her White male counterparts, evidences a systematic pattern of discrimination.

33. This pattern of discrimination is supported by the complaints of two other African American women who left the IT department after reporting similar incidents.

**A Pattern and Practice of Discriminatory Conduct**

34. The discrimination Ms. Finkley suffered is part of a documented pattern within the IT Department.

35. City records show that since Paul Jones became CIO in August 2019, the IT department has experienced significant turnover among African American female employees.

36. Many of these female employees reported similar discriminatory treatment like what Ms. Finkley endured.

37. Defendant conducted an internal investigation in December 2021 due to complaints about Jones' conduct.

38. Defendant's own investigation substantiated the allegations finding that Jones' behavior was "confrontational, impulsive and sometimes punitive" toward IT employees, and that "he occasionally could not control his temper, was demeaning, and not willing to listen to others' point of view." **See Exhibit 1**.

39. Following the December 2021 investigation, Defendant was on actual notice that Jones engaged in discriminatory and unprofessional conduct toward female employees and employees of color.

40. Defendant had further notice through the pattern of African American female employees departing the IT Department after reporting discriminatory treatment during Jones's tenure from August 2019 through December 2024.

41. Despite this actual knowledge, Defendant's policymakers made a conscious choice to retain Jones in his supervisory position with continued

unfettered discretion over work assignments, remote work approvals, and employee discipline.

42. Defendant's City Administrator, Faye W. Johnson, and Human Resources Director, Jose-Luis Rodriguez, were directly informed of the December 2021 investigation findings.

43. Despite these substantiated findings of reprehensible and unprofessional conduct by Jones, Defendant did nothing more than require Jones to attend a single training session. No disciplinary action was imposed, no meaningful oversight was implemented, and no policy changes were made to prevent future discriminatory conduct by Jones or any other supervisor.

44. On February 26, 2025, Defendant revealed the results of its investigation arising out of Ms. Finkley's August 12, 2024 complaint. **See Exhibit 2.**

45. The investigation involved 38 out of 44 IT department employees.

46. The investigation again put Defendant on notice that Jones' engaged in "unprofessional behavior towards IT employees" that was "confrontational, impulsive and sometimes punitive."

47. The investigation further uncovered that "almost every employee described the culture/environment at the department as: unwelcome, tense, hostile, toxic, a culture of fear, employees on edge."

48. Ms. Finkley's complaint again put Human Resources Director, Renee Govig, and City Administrator, Faye W. Johnson, on notice of discriminatory conduct by Jones.

49. Rather than taking immediate corrective action, Defendant permitted Jones to continue supervising Ms. Finkley and allowed the retaliatory conduct alleged herein to escalate from August 2024 through December 2024.

50. Defendant's failure to remove Jones from supervisory authority over Ms. Finkley, transfer Ms. Finkley to another department, or implement meaningful oversight constitutes deliberate indifference to Ms. Finkley's constitutional rights.

51. Defendant maintained an official policy and custom of allowing Jones unfettered discretion over critical terms and conditions of employment, including: approval or denial of remote work privileges; assignment and removal of work applications and software access; assignment and removal of project management duties; and imposition of heightened surveillance and reporting requirements.

52. This policy was not accompanied by adequate guidelines, oversight mechanisms, or anti-discrimination safeguards.

53. Defendant's failure to establish objective criteria or meaningful oversight for these employment decisions, despite knowing that such unchecked discretion had resulted in substantiated discrimination complaints, constitutes deliberate indifference to the constitutional rights of employees.

**Defendant's Retaliation Against Ms. Finkley's Protected Activity**

54. On August 12, 2024, Ms. Finkley engaged in protected activity by reporting discrimination to Human Resources.

55. The temporal proximity between Ms. Finkley's protected complaint and Defendant's adverse actions establishes a clear pattern of retaliation.

56. On August 15, 2024, three days after Ms. Finkley's complaint, Jones retaliated during a meeting by calling Ms. Finkley "arrogant" and a "know it all," while also stating she was "not as smart as [she] thought [she] was."

57. On August 19, 2024, Ms. Finkley met with human resource representative Ariana Lewis as a follow up to her August 12, 2024 meeting and to provide an update on her work environment and Jones' treatment of her.

58. On August 20, 2024, five days after Ms. Finkley's complaint and only one day after her meeting with Ariana Lewis, Jones implemented mandatory daily meetings and excessive reporting requirements specifically targeting Ms. Finkley. These requirements were not imposed on other employees.

59. In September 2024, Jones began systematically removing Ms. Finkley from applications and software programs that she needed to perform her job duties. Specifically, Jones removed Ms. Finkley from the following critical systems:

   a. Enterprise Permitting and Licensing (EPL) Application: Removal from the EPL ticketing system prevented Ms. Finkley

  from handling support tickets despite this being part of her core job responsibilities.

  b. Legal Files Application: Removal of Ms. Finkley from Legal Files terminated Ms. Finkley's role in managing the work within the application, which she had been successfully doing, with colleague Jamie Gummere.

  c. WPB Key Application: Removal from this application prohibited Ms. Finkley from continuing her work managing the application with her colleague, Amado Yamasaki.

60.  Jones systematically removed Ms. Finkley from critical project management responsibilities that were essential functions of her position as Systems Analyst:

  a. EPL Reporting Project: Ms. Finkley was barred from managing the critical EPL reporting project, despite her successfully training contractor Jerry Binder and establishing the project requirements.

  b. Parks Maintenance Implementation: Ms. Finkley was removed from the Parks Maintenance application implementation after she had successfully coordinated with multiple departments, secured discounted tablets, arranged training, and established vendor relationships.

      c. Utility System Documentation: Jones discontinued Ms. Finkley's assignment to the document utility system application workflow after only one meeting.

61. In addition to removing the tools and systems Ms. Finkley needed to perform her job duties, Jones began subjecting her to heightened monitoring and surveillance intended to intimidate her.

62. On September 3, 2024 and September 25, 2024, following Ms. Finkley's class action grievance and union grievance, Jones recruited his subordinates to physically walk by Ms. Finkley's office to confirm she was present and working.

63. On October 11, 2024, Jones inserted himself into every MainTrac meeting involving Ms. Finkley, a practice that had not existed before her complaint.

64. By contrast, Jones did not require his attendance at comparable meetings involving similarly situated non-African American or male employees.

65. On November 18, 2024, Ms. Finkley was subjected to additional demands for detailed work documentation in an unscheduled meeting, including requirements to provide "hour by hour tasks completed" and document "time spent on the request."

66. These requirements far exceeded normal departmental standards and were not required of other similarly situated non-African American or male employees.

67. Jones imposed mandatory lunch schedules on Ms. Finkley, a restriction not applied to other similarly situated non-African American or male employees in the department who did not complain to Human Resources.

68. In November 2024, Jones changed Ms. Finkley's attendance requirement for department staff meetings from "required" to "optional," further isolating her from department activities. No other employee supervised by Jones experienced this change in the attendance requirement.

69. Jones prohibited Ms. Finkley from scheduling meetings or communicating directly with departments she had been successfully working with prior to filing her complaint.

**Impact of Defendant's Retaliatory Conduct**

70. The systematic removal of access and duties made it impossible for Ms. Finkley to perform the essential functions of her position as Systems Analyst.

71. The removal of project management duties contradicted Ms. Finkley's job title and responsibilities as a Systems Analyst.

72. These retaliatory actions created significant barriers to Ms. Finkley's ability to perform her job duties and caused her to experience sleep issues, emotional distress, increased heart rate, and heightened anxiety.

**Defendant Unlawfully Terminates Ms. Finkley**

73. The escalating pattern of discrimination and retaliation was a clear campaign to force Ms. Finkley's resignation.

74. However, even though the conduct made Ms. Finkley's working conditions intolerable, Ms. Finkley continued to attempt to perform her job duties.

75. When Defendant's campaign to force Ms. Finkley's resignation through the systematic removal of her job duties, hostile surveillance, and retaliatory conduct failed, Defendant took matters into its own hands and terminated Ms. Finkley on December 13, 2024.

76. Ms. Finkley's termination was in direct retaliation for her protected activity of filing complaints of discrimination with human resources and participating in union grievance proceedings.

77. Defendant's discrimination and retaliation against Ms. Finkley was carried out pursuant to official municipal policy, custom, or practice, and with deliberate indifference by municipal policymakers with final authority.

**COUNT I - RACE DISCRIMINATION IN VIOLATION OF TITLE VII**

78. Plaintiff adopts, realleges and incorporates by reference all allegations contained in paragraphs 1 through 77 as if fully set forth herein.

79. Defendant discriminated against Ms. Finkley on the basis of her race, African American, in violation of Title VII by subjecting her to different terms and conditions of employment, including but not limited to, denial of remote work

privileges, and hostile treatment not experienced by similarly situated non-African American employees.

80. As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered and continues to suffer damages including lost wages, benefits, emotional pain, suffering, inconvenience, and mental anguish.

## COUNT II - GENDER DISCRIMINATION IN VIOLATION OF TITLE VII

81. Plaintiff adopts, realleges and incorporates by reference all allegations contained in paragraphs 1 through 77 as if fully set forth herein.

82. Defendant discriminated against Plaintiff on the basis of her gender, female, in violation of Title VII by subjecting her to different terms and conditions of employment and hostile treatment as part of a pattern of targeting women of color within the IT Department.

83. As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered and continues to suffer damages including lost wages, benefits, emotional pain, suffering, inconvenience, and mental anguish.

## COUNT III - RETALIATION IN VIOLATION OF TITLE VII

84. Plaintiff adopts, realleges and incorporates by reference all allegations contained in paragraphs 1 through 77 as if fully set forth herein.

85. Plaintiff engaged in protected activity under Title VII by filing complaints of discrimination with Defendant's Human Resources Department and participating in union grievance proceedings.

86. Defendant, through its agent Paul Jones, retaliated against Plaintiff because of her protected activity by subjecting her to escalating adverse employment actions, including but not limited to: verbal harassment and demeaning comments, mandatory daily meetings, excessive reporting requirements, systematic removal from necessary work applications and project management duties, mandatory supervision during meetings, surveillance through subordinates, threatening statements by management, and ultimately termination of her employment.

87. There was a causal connection between Plaintiff's protected activity and the adverse employment actions, as evidenced by the temporal proximity and escalating pattern of retaliation following her complaints.

88. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered and continues to suffer damages including lost wages, benefits, and other employment opportunities, as well as emotional pain, suffering, inconvenience, and mental anguish.

**COUNT IV - RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981**

89. Plaintiff adopts, realleges and incorporates by reference all allegations contained in paragraphs 1 through 77 as if fully set forth herein.

90. Defendant discriminated against Plaintiff on the basis of her race in violation of Section 1981 by denying her the same rights to make and enforce

contracts as are enjoyed by white citizens, including the right to equal terms and conditions of employment.

91. Defendant's discrimination was carried out pursuant to official policy or custom, or with deliberate indifference by municipal policymakers. Defendant's pattern of retaining Paul Jones despite repeated substantiated findings of unprofessional conduct, combined with the failure to take adequate corrective action, demonstrates deliberate indifference to the constitutional rights of African American employees.

92. As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered and continues to suffer damages including lost wages, benefits, emotional pain, suffering, inconvenience, and mental anguish.

## **COUNT V - RETALIATION IN VIOLATION OF 42 U.S.C. § 1981**

93. Plaintiff adopts, realleges and incorporates by reference all allegations contained in paragraphs 1 through 77 as if fully set forth herein.

94. Defendant retaliated against Plaintiff for opposing racial discrimination in violation of Section 1981 by subjecting her to escalating adverse employment actions culminating in her termination.

95. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered and continues to suffer damages including lost wages, benefits, emotional pain, suffering, inconvenience, and mental anguish.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, Tasha Finkley, respectfully requests that this Honorable Court:

A. Enter judgment in favor of Plaintiff and against Defendant on all counts;

B. Award Plaintiff compensatory damages for lost wages, benefits, and other pecuniary losses;

C. Award Plaintiff compensatory damages for emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life;

D. Award Plaintiff reasonable attorneys' fees and costs pursuant to Title VII and Section 1981;

E. Award Plaintiff pre- and post-judgment interest; and

F. Grant such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: February 9, 2026

RESPECTFULLY SUBMITTED,

*/s/ Denise A. Mutamba*
Denise Mutamba, Esq.
Florida Bar No: 111727
MDM Legal, PLLC
7754 Okeechobee Blvd, #4-3068
West Palm Beach, FL 33411
Email: denise@mdmattorneys.com
filing@mdmattorneys.com
Phone: (561) 872-3601
*Attorney for Plaintiff*